# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 05-01076-TUC-FRZ (GEE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| DALE JAMES JOHNSON, | |
| Defendant. | |

The District Court referred this case to the Magistrate-Judge for hearing on pretrial motions. Dale Johnson asks this court to suppress all evidence obtained as a result of an allegedly illegal stop of his vehicle on May 7, 2005. Hearing on the motion was held on November 3rd and December 21st, 2005. Upon consideration of the evidence presented at the hearing and the arguments of counsel, the Magistrate-Judge recommends the District Court deny the defendant's Motion to Suppress.

## CHARGE:

It is charged that on or about May 7, 2005, the defendant knowingly and intentionally possessed with intent to distribute approximately 272 pounds of marijuana in violation of Title 21, U.S.C., §§841(a)(1) and 841(b)(1)(B)(vii).

S. SHERICK, C. CORLETT, FRZ

A.B. 1/6/06

**EVIDENCE:**

*Michael Van Wagenen*

Van Wagenen has been employed as a Border Patrol agent for over three years. At about 8 a.m. on May 7, 2005, he was in a marked Border Patrol vehicle, southbound on Federal Route 15 (FR 15) to work near the Sells area on the Tohono O'Odham Indian Nation. That area is about 55-60 miles north of the United States-Mexico border . There are two major paved routes in the area: FR 15 runs north/south, and State Route 86 (SR 86) runs east/west. FR 15 is a two lane highway–one lane going in each direction; and there is usually "very light traffic on that road."

That time of day is significant because it is "shift change" for Border Parol and "is generally a time where smuggling operations tend to happen more frequently than other times during the day." Van Wagenen stated that based on his experience and training FR 15 has a "very high concentration of illegal activity that drives north on that road away from the border. It's pretty much the only road that will go directly north ...from the border."

Van Wagenen had observed very light traffic on FR 15 on the morning of May 7th–he had traveled five miles encountering no northbound traffic. Then he encountered three northbound vehicles riding in tandem–about 100 yards apart; "in tandem" being a common means of traveling when persons are engaged in criminal activity. The occupants of all the vehicles waved at Van Wagenen which he testified was "very uncommon." The drivers and the passenger in the first two vehicles waved, and the driver, but not the passenger, in the third vehicle waved. Van Wagenen testified it was really uncommon to have this number of people wave at him in a short time period because his experience has been that the residents of the Tohono O'Odham Nation are generally hostile toward Border Patrol because their presence is felt to be inconsistent with the Nation's sovereign status.

Van Wagenen decided to investigate further and turned his vehicle around, falling in behind the third vehicle, a white Dodge Intrepid. He noticed that as other southbound Border Patrol vehicles passed, the driver of the Dodge would tap his brakes to slow down. Van

1  Wagenen thought this was "uncommon" because from his experience most residents of the
2  Nation know that Border Patrol agents have no authority to stop vehicles to enforce the speed
3  limit. However, he felt the slowing was "consistent with being nervous, acting as if they're
4  doing something that they shouldn't be doing that, if the Border Patrol caught them, they
5  could be in trouble." The Dodge (which Van Wagenen later learned was being driven by the
6  defendant) was initially traveling between 65-70 mph, which although above the 55 mph
7  posted limit, was "consistent with the traffic" in that "very rural area." Van Wagenen
8  testified he could not see the vehicles in front of the defendant.

9  Van Wagenen ran a license check on the Dodge and learned the registered owner was
10 Nadine June Norris. He recognized that as the name of a person who had been the registered
11 owner of other vehicles stopped by Border Patrol and found to contain illegal aliens. Van
12 Wagenen then turned on his emergency overhead lights, "called in" that he was making a
13 vehicle stop, and noticed another southbound Border Patrol vehicle, driven by Maribel
14 Reyes, turned around to assist him.

15 The defendant did not stop immediately, but traveled about three miles before
16 stopping. During that time Van Wagenen noticed the driver and passenger began talking to
17 each other for the first time since he had begun to observe them; he testified this, from his
18 experience and training, was consistent with them "coming up with a plan what to do during
19 a vehicle stop." Van Wagenen testified that from the time he activated his lights until the
20 time the defendant stopped three miles later, there was no impediment to the defendant
21 stopping–there was a shoulder on the side of the road with "plenty of room to stop."

22 Once the defendant stopped, the passenger jumped from the vehicle and over a barbed
23 wire fence, and fled. Van Wagenen unsuccessfully pursued the passenger while agent Reyes
24 approached the driver's side of the stopped vehicle. Bundles of marijuana were found in the
25 trunk and back seat of the defendant's vehicle.

26 On cross examination Van Wagenen testified FR15 is "pretty much the only route"
27 that residents of the Tohono O'Odham Nation can use to travel to either Casa Grande or

1  Tucson and therefore it is used not only by persons engaged in criminal activity, but also by
2  those engaged in their "normal day-to-day activity." He admitted no effort had been made
3  to stop the other two vehicles preceding the defendant. He first saw the three vehicles
4  traveling in tandem between mileposts 15 and 14, and turned around to follow the Dodge
5  between mileposts 11 and 15. Milepost 11 is south of the village of Santa Rosa, and milepost
6  15 is "just north" of Santa Rosa. He testified that on roadways off the reservation it is not
7  uncommon to have vehicle occupants wave at Border Patrol agents. Van Wagenen also
8  testified that on the morning in question he saw "probably ten southbound" Border Patrol
9  vehicles, and that during shift change there are actually more Border Patrol vehicles on the
10 road than at other times. He also stated there are roads which intersect with FR 15 both north
11 and south of Santa Rosa whereby a person could exit the highway, drive through Santa Rosa
12 and return to the highway, thus avoiding that portion of FR 15 where Van Wagenen
13 encountered the defendant. However, none of those roads led off the reservation. Wagenen
14 also admitted that some drivers will tap their brakes and slow down whenever they see any
15 law enforcement vehicle.

16 Van Wagenen testified that the passenger in the Dodge sat very rigid during the time
17 before he turned on his overhead lights and this led him to believe the passenger was in the
18 country illegally. He did not know the driver was Native American until after the stop
19 occurred.

### Nadine Norris

22 Norris testified for the defense. She is the defendant's mother and had owned the
23 Dodge for about a month before he was arrested on May 7th. She has never been arrested,
24 and has never been stopped for alien smuggling in any car she has owned.

25 On cross examination she stated she has only had two vehicles ever registered in her
26 name: the white Dodge and a Chevy truck before that. She never loaned the truck to anyone.
27 The defendant lives with her in Sells and about 8 a.m. on May 7th he asked to borrow the

1  Dodge in order to pickup his girlfriend and their daughter and go to the store to buy milk.
2  When the defendant left in the Dodge there was no one else in the car.

3

4  **_Maribel Reyes_**

5  Reyes is a Border Patrol agent. At about 7:30 a.m. or 8 a.m. on May 7th she was
6  southbound in a marked vehicle on FR 15, between the villages of Komelic and Santa Rosa,
7  when she saw a lot of oncoming traffic and reduced her speed to watch the traffic. She saw
8  three vehicles apparently traveling in tandem which aroused her suspicion that they might
9  be involved in smuggling drugs or undocumented individuals. She did not notice the
10 behavior of the occupants in the first two vehicles. She focused more on the third vehicle
11 and noticed the male driver waved at her. She observed the male passenger was sitting in
12 a "stiff upright position, kind of like avoiding that I was there, my presence." She noticed
13 the passenger looked in her direction and then turned away.

14 Most often she said that she gets "flipped off" when driving on the reservation. She
15 testified that in the past when vehicle occupants have waved at her it has been when vehicles
16 are traveling in tandem and stops of those vehicles has yielded drugs or undocumented
17 individuals.

18 After the third vehicle passed her on the 7th she pulled onto the road shoulder and
19 continued watching it. She noticed the rear of the vehicle "appeared to be low as in like
20 almost in [sic] the ground." She decided she would turn around, follow the vehicles and
21 request vehicle registration information. However, before she actually turned around she
22 noticed another Border Patrol vehicle behind the third vehicle., and she waited for that
23 vehicle to pass before turning around. By then the vehicles were "pretty far north" of her
24 position. She had observed the license plate of the third vehicle traveling in tandem, and
25 when she called in for its registration information the dispatcher advised her that Van
26 Wagenen had already made such a request. Because she and Van Wagenen were on different
27 radio frequencies she had not heard his request regarding the same license plate, and in fact
28

1 she had thought he was ending his shift, returning to the station, and not investigating the
2 vehicle in front of him. Van Wagenen was about three miles ahead of her when she switched
3 to his frequency and then saw his overhead lights on. She could not see the vehicle(s) in
4 front of Van Wegenen. When she finally arrived where Van Wagenen and the other vehicle
5 were pulled over, she saw him running into the desert, and as she approached she noticed the
6 driver of the suspect vehicle was still inside.

7 On cross examination Reyes testified the vehicle stop occurred north of the village of
8 Santa Rosa (mileposts 13 and 14) between the village of North Komelic (milepost 15) and
9 Santa Rosa. She stated she had no radio contact with Van Wagenen before he turned on his
10 overhead lights to stop the defendant's vehicle. She did not write a report in this case because
11 she was not the "primary agent"; however, she did review Van Wagenen's report to prepare
12 for her testimony.

13

14 **DISCUSSION:**

15 The defendant argues Van Wagenen's decision to stop him was no more than a
16 "hunch" based upon his having waved at the agent, and that "hunch" does not support the
17 constitutional requirement of reasonable suspicion.

18 The search and seizure of a motorist suspected of criminal activity is analyzed
19 according to the framework set out in *Terry v. Ohio,* 392 U.S. 1 (1968). For a lawful
20 investigatory stop the officer must have a "reasonable suspicion supported by articulable
21 facts that criminal activity 'may be afoot'." *United States v. Sokolow,* 490 U.S.1,7 (1989).
22 In determining whether reasonable suspicion existed to justify an investigatory stop, a
23 reviewing court is required to "look at the totality of the circumstances of each to see whether
24 the detaining officer ha[d] a particularized and objective basis for suspecting legal
25 wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273 (2002)(internal punctuation
26 removed). "All relevant factors must be considered in the reasonable suspicion
27 calculus—even those factors that, in a different context, might be entirely innocuous." *United*
28

1  *States v. Fernandez-Castillo,* 324 F.3d 1114, 1117 (9th Cir.) (citing *Arvizu,* 534 U.S. at 277-
2  78), *cert. denied,* 124 S. Ct. 418 (2003). Furthermore, each item of information is not to be
3  considered in isolation, with a "divide-and-conquer analysis", rather the court must look to
4  the "totality of the circumstances. *Arvizu* at 274. This process allows officers to draw on
5  their own experience and specialized training to make inferences from and deductions about
6  the cumulative information available to them. *Id.* "In the context of Border Patrol [stops],
7  the factors to be considered in determining whether 'reasonable suspicion' exists to justify
8  stopping a vehicle include, but are not limited to": (1) characteristics of the area; (2)proximity
9  to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug
10 smuggling in the area; (5) behavior of the driver, including 'obvious attempts to evade
11 officers'; (6)appearance or behavior of passengers; (7) model and appearance of the vehicle;
12 and (8) officer experience. *United States v. Garcia-Barron,* 116 F.3d 1305, 1307 (9th Cir.
13 1997).

14       In the present case Van Wagenen made the decision to initiate the vehicle without any
15 input from agent Reyes. Therefore, his testimony is most critical in determining the question
16 of reasonable suspicion. However, Reyes' testimony is important to the extent it tends to
17 support or contradict Van Wagenen's. Van Wagenen testified that the area on FR 15 where
18 he first saw the defendant's vehicle was approximately 55-60 miles north of the Mexican
19 border, and the significance of this distance is greatly increased by his testimony that FR 15
20 is "pretty much" the only road that leads directly north from the border. He also testified FR
21 15 has a "very high concentration of illegal activity that drives north...away from the border."
22 It was not disputed that the interests of both Van Wagenen and Reyes were piqued when they
23 saw the same three cars traveling in tandem, and both testified their experience led them to
24 suspect illegal activity in such a circumstance. While Van Wagenen said the drivers and/or
25 occupants of all three vehicles waved at him, Reyes testified she did not notice the behavior
26 of those in the first two vehicles but did notice the driver of the third vehicle–the defendant–
27
28

waved at her. Both agents stated the waving was unusual in that area where they customarily experienced hostility toward the Border Patrol.

Van Wagenen testified smuggling activities generally increased during Border Patrol shift changes which was the time period he observed the defendant's vehicle traveling in tandem. His subsequent admission that there were actually more Border Patrol vehicles on the road during shift change does not necessarily undermine the significance of this time period. It could be explained that smugglers assume that many of the northbound agents are ending their shift and returning to their headquarters, and perhaps are less inclined to initiate a stop which may cause them to have to remain at work significantly longer, especially if the stop results in the seizure of illegal drugs or aliens. In this regard it should be noted that even though Reyes was directly behind Van Wagenen she did not assume he was also involved in investigating the defendant's vehicle directly in front of him; instead she thought Van Wagenen had ended his shift and was returning north to headquarters.

Van Wagenen also testified his decision to stop the defendant was further influenced by the defendant applying his brakes as southbound Border Patrol vehicles approached (these would presumably be agents just beginning their shift and more willing to investigate and initiate a stop), and by the very rigid posture of the passenger in the defendant's car.

Lastly, Van Wagenen stated that when he learned the registered owner of the Dodge was "Nadine June Norris" he recognized that as the of a person who had owned other vehicles involved in alien smuggling. The fact that defendant's mother, who gave her name as"Nadine Norris", testified she has never owned a vehicle involved in alien smuggling, does not necessarily undermine the agent's credibility. "Norris" is not an uncommon surname on the Tohono O'Odham nation and there was no evidence that a "Nadine June Norris" had not, in fact, been the registered owner of vehicles involved in smuggling aliens.

This court concludes agent Van Wagenen had sufficient articulable facts to form a reasonable suspicion and conduct an investigatory stop of the defendant.

**RECOMMENDATION:**

In view of the foregoing, it is recommended that after its independent review of the record the District Court **DENY** the Motion to Suppress. This Report and Recommendation is being faxed to all counsel on this date. Each counsel may serve and file written objections within 10 days. If objections are not timely filed, the party's right to de novo review may be waived. **If objections are filed, they should be directed to the District Court by omitting the magistrate's initials: CR-05–01076-TUC-FRZ.**

The Clerk of the Court is directed to send a copy of this Report and Recommendation to all counsel.

DATED this 6th day of February, 2006.

/s/ Glenda E. Edmonds
Glenda E. Edmonds
United States Magistrate Judge